**In re Shawn R. PLEDGER and Karen D. Pledger, Debtors.**

No. 01–42739–JSS–13.

United States Bankruptcy Court, N.D. Alabama, Eastern Division.

March 15, 2002.

Lisa M. Hancock, Guntersville, AL, for debtors.

Linda B. Gore, Gadsden, AL, Chapter 13 Standing Trustee.

## MEMORANDUM OPINION

JAMES S. SLEDGE, Bankruptcy Judge.

This matter came before the Court on February 6, 2002, for hearing on confirmation of the plan of reorganization proposed by the Debtors and the objection to same filed by the Standing Chapter 13 Trustee (hereinafter "Trustee"). The basis for the Trustee's objection was that the interest compensation factor was insufficient with regard to each allowed secured claim provided for by the plan. Upon consideration of all the evidence, this Court took the matter under advisement and now renders its findings of fact and conclusions of law as set forth in this Memorandum Opinion in accordance with Fed. R. Bankr.P. 7052, applying Fed.R.Civ.P. 52. As discussed below, the Court has determined a new hearing must be held in order to allow the parties to present evidence utilizing the proper standard for determining interest rates as set forth in this opinion.

## JURISDICTION

This bankruptcy case requires the Court to determine the appropriate rate of interest required to afford secured creditors present value under § 1325(a)(5). Pursuant to 28 U.S.C. §§ 157(a), 1334(a), 1334(e), and the Standing Order of Reference in the Northern District of Alabama (Ord.Ref.(N.D.Ala. July 17, 1984)), this Court has original and exclusive jurisdiction to hear and determine all cases under title 11. In accordance with 28 U.S.C. § 157(b)(2)(A), (L), and (O), this determination constitutes a core proceeding in which this Court is empowered to enter appropriate orders and judgments. Venue of this Adversary Proceeding is proper and has not been challenged. *See* 28 U.S.C. § 1409(a); Bankr.L.R. 1070–1, and 1073–1(a). Thereby, this Court concludes that subject matter, in personam, and in rem jurisdiction is proper in this tribunal.

## FINDINGS OF FACT

On November 29, 1999, the Debtors, Shawn R. Pledger and Karen D. Pledger, entered into a retail installment contract with Majr Financial Corporation (hereinafter "Majr") for the purchase of a computer. The terms of the contract provided

that the Debtors would repay $3,598.56, the total sale price of the computer, with an annual percentage rate of 18%. (Trustee's Exhibit No. 2) The Debtors filed this bankruptcy case under Chapter 13 of Title 11 on July 26, 2001. They scheduled Majr as a secured creditor and valued the computer in the amount of $500.00, leaving Majr with an unsecured claim in the amount of $2,769.64. In the Debtors' original plan of reorganization, in order to pay Majr the amount of its secured claim, the Debtors proposed to pay Majr $13.55 per month over a period of 49 months. This monthly payment amount was calculated by adding an interest rate of 10% to Majr's secured claim as valued by the Debtors.

On January 14, 2002, the Debtors filed an amended plan which changed the terms set forth above. (Doc. No. 18) In the amended plan, the Debtors proposed to pay Majr $29.58 per month over a period of 24 months. This monthly payment was calculated using an interest rate of 8%. It is that rate to which the Standing Chapter 13 Trustee objected, arguing that the proposed rate was insufficient to provide Majr with present value as required by 11 U.S.C. § 1325(a)(5)(B)(ii).[1]

At the hearing on confirmation, argument was presented by counsel for the Debtors that the proposed 8% is the appropriate interest rate that should be approved by the Court. According to the Debtors, this rate encourages the reorganization process as well as precludes the creditor from receiving a profit through a Chapter 13 bankruptcy setting. Conversely, the Trustee presented argument that, based upon Eleventh Circuit precedent, the interest rate should be higher reflecting a true "market rate." Only through a market rate will secured creditors receive their statutory entitlement of present value. The issue was left to the Court to determine the appropriate interest rate that Majr is entitled to receive on its secured claim.

## CONCLUSIONS OF LAW

Section 1325(a)(5)(B)(ii) requires the Court to confirm a plan of reorganization if, with respect to allowed secured claims provided for by the plan, the value of property to be distributed under the plan on account of such claims is not less than the allowed amount of such claim.[2] This

---

1. As discussed in full below, in order for the secured creditor to get present value equal to the amount of the allowed secured claim as required in § 1325(a)(5)(B)(ii), the debtors must pay some amount of interest to account for the delay in the secured creditor being paid through a plan of reorganization. The amount of interest, sometimes referred to as "discount rate," is the subject of the controversy in this case.

2. Section 1325(a) provides in full: (a) Except as provided in subsection (b), the court shall confirm a plan if—

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and

(ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; or

provision has been interpreted by the Supreme Court as requiring the debtor to provide the secured creditor "with payments, over the life of the plan, that will total the present value of the allowed secured claim...." *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 957, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The perplexing part of the statute has been determining exactly what constitutes "present value."

■ "The 'present value' concept can be expressed by the following proposition: a dollar in hand today is worth exactly the same as (1) a dollar to be received a day, a month or a year hence plus (2) the rate of interest which the dollar would earn if invested at an appropriate interest rate." *In re The Beare Company*, 177 B.R. 883, 885 (Bankr.W.D.Tenn.1994) (citing COLLIER ON BANKRUPTCY ¶ 1129.03[4][f][i] (15th ed.1993)). Applied to the bankruptcy confirmation context, the plan is required to pay interest on an allowed secured claim in order to provide the secured creditor with the present value of the claim, and, thus, avoid a diminution in the value of the claim due to deferred payments over the lifetime of the plan. *U.S. v. Arnold*, 878 F.2d 925, 928 (6th Cir.1989).

■ The issue is the appropriate rate of interest to be assessed. The Eleventh Circuit Court of Appeals previously addressed the appropriate rate of interest to be applied in calculating deferred payment of delinquent federal taxes. *United States v. Southern States Motor Inns, Inc. (In re Southern States Motor Inns, Inc.)*, 709 F.2d 647 (11th Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). The Court held that "...creditors required to accept deferred payments...should be placed in as good a position as they would have been had the present value of their claims been paid immediately," and that they, therefore, should receive interest at the "current market rate." *Id.* at 652–53. While this Court acknowledges that it is bound by that determination as to the appropriate rate,[3] the question remains as to how the current market rate is to be calculated. *Southern States* seems to permit almost any analysis of market rate.

■ The numerous decisions by the Circuit Courts illustrate the divergence of opinion as to what constitutes market rate. Although the majority of the circuits (the Third, Fourth, Fifth, Sixth, Seventh and Tenth) that have addressed this precise issue have adopted the "coerced loan" method, wherein the court "look[s] to the interest rates charged by the creditor making a loan to a third party with similar terms, duration, collateral, and risk,"[4] support may also be found in the circuits (the Second and Eighth) for the opposing "for-

(C) the debtor surrenders the property securing such claim to such holder; and
(6) the debtor will be able to make all payments under the plan and to comply with the plan.

3. While the *Southern States* decision dealt with interest rates in a Chapter 11 context, "...as a matter of bankruptcy law, it would be hard to argue that the phrase 'value, as of the effective date of the plan' should have a different meaning in section 1129(a)(9)(C) from its meaning in section 1129(b)(2)(A)(i)(II) or in section 1325(a)(5)(B)(ii)." David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 447 (1998). *See also In re Felipe*, 229 B.R. 489, 491 (Bankr.S.D.Fla.1998) (stating that in the absence of reported case law in the Eleventh Circuit determining interest rates in Chapter 13 cases, the court must rely on the Circuit's interpretation of similar provisions of the Bankruptcy Code).

4. *In re Felipe*, 229 B.R. 489, 492 (Bankr. N.D.Fla.1998).

mula" method of determining the appropriate market rate. Under the formula approach, an objective interest rate is based on the sale of treasury bills and risk points are added as needed to compensate for the risks associated with a particular case. *See In re Hollinger*, 245 B.R. 691, 694 (Bankr. N.D.Fla.2000), *rev'd. in part, Household Automotive Finance v. Hollinger*, 265 F.3d 1066 (11th Cir.2001). It is undisputed that both approaches are based on speculation and fiction. With regard to the formula approach, " '[t]he add-on factors used by many courts seem to be arbitrary and certainly do not represent the financial market's true evaluation of the risk involved in the various kinds of loans that are forced on lenders in Chapter 13 cases.' " David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 463 (1998) (quoting 2 Keith Lundin, *Chapter 13 Bankruptcy* § 5.42 at 5–147 (2d ed.1994)). Additionally, "[c]ommentators have been critical of the accuracy and validity of the coerced loan approach." *Id.* at 464. Specifically, the coerced loan approach has been criticized as unrealistic on the grounds that no "... actual market exists in which lender makes loans to debtors under the circumstances which generally prevail in reorganization." *Id.*

In *American General Finance, Inc. v. Kleinknecht*, 230 B.R. 207 (M.D.Ga.1999), the District Court for the Middle District of Georgia focused on the similarities of the two approaches rather than their differences. Recognizing the aforementioned weaknesses of each approach, the Court held that "either approach is an appropriate method of selecting the applicable rate in a Chapter 13 cram down, so long as the bankruptcy court gives appropriate consideration to all factors." *Id.* at 212. However, the Bankruptcy Court for the Southern District of Florida in *In re Felipe*, 229 B.R. 489, 492 (Bankr.S.D.Fla.1998), stated

that careful analysis of the factors set out by the Eleventh Circuit in *Southern States*, reveals that the Court actually endorsed the coerced loan approach by looking to interest rates charged by a lender extending similar terms on a loan of similar duration with comparable collateral and risk. *Id.* Considering the mandate from *Southern States*, as applied to both the formula approach and the coerced loan approach, this Court determines that the coerced loan approach is the best method for creditors to be "placed in as good a position as they would have been had the present value of their claims been paid immediately." *Southern States*, 709 F.2d at 652–53.

▪ Upon making that determination, however, we have merely taken the first step for determining the appropriate rate of interest under § 1325(a)(5)(B)(ii). Having decided that the coerced loan approach most accurately satisfies the present value requirement of § 1325(a)(5)(B)(ii), this Court further concludes that a benchmark in this area will aid both debtors and creditors and will decrease the likelihood of costly litigation in Chapter 13 cases. The Court concludes that a rebuttable presumption should be created in favor of the original contract rate of interest. As the Third Circuit has stated:

The contract rate of interest is, of course, the rate that the creditor voluntarily agreed to accept at an earlier date. While in some cases the passage of time will have seen a material increase or decrease in the lending rate of the creditor, the contract rate is a fair place to begin. In the absence of a stipulation regarding the creditor's current rate for a loan of a similar, character, amount and duration, we believe it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come

forward with persuasive evidence that its current rate is in excess of the contract rate. Conversely, utilizing the same rebuttable presumption approach, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate.

*General Motors Acceptance Corporation v. Jones*, 999 F.2d 63, 70–71 (3rd Cir.1993). *See also Green Tree Financial Servicing Corporation v. Smithwick (In re Smithwick)*, 121 F.3d 211, 215 (5th Cir.1997), *cert. denied*, 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998) (holding that a rebuttable presumption with regard to the contract rate "balances the competing considerations of maximizing judicial economy and ensuring an accurate reflection of the costs and risks associated with the secured lenders 'forced' extension of credit. . . ."); *Koopmans v. Farm Credit Services of Mid–America*, 102 F.3d 874, 875 (7th Cir. 1996); *In re Felipe*, supra at 493.

■ Upon objection to confirmation[5] based on the interest rate proposed in the plan, the burden of proof will be on the party seeking a deviation from the contract rate. For a creditor to request an interest rate above the contract rate, the burden of proof will be on that creditor to show that the market rate is in accordance with the rate that is being requested. Conversely, if a debtor seeks to use an interest rate below the contract rate, the debtor must show that market rate supports the reduced rate.

■ This Court further concludes the evidence to be presented as to the market rate is not restricted to loans made by the specific secured claimant. The market rate considers the lending practices of other lenders making loans of similar character, amount, and duration. The broader perspective modifies the strict coerced loan approach that only considers loans made by the secured claimant. *See Hardzog v. Federal Land Bank of Wichita (In re Hardzog)*, 901 F.2d 858 (10th Cir.1990) (the current market rate for similar loans made in the region). Using a regional perspective, the Court will be better able to determine a true market rate for the loans in question. *See General Motors Acceptance Corp. v. Jones*, 999 F.2d 63 68 (3rd Cir.1993); and *American General Finance, Inc. v. Kleinknecht*, 230 B.R. 207, 210 (M.D.Ga.1999).

At the hearing on confirmation, the Debtors argued against a market rate stating that a market rate affords creditors a profit in a Chapter 13 bankruptcy setting. This Court acknowledges the possibility for creditors to profit by using a market rate of interest. However, the profit to be realized by the creditors is not the profit from the loan transaction but instead the profit which would be realized if the creditor were paid immediately and reinvested the funds. Professor Epstein put it this way, ". . . in a cram down, the secured creditor is not asking for payment of the 'profit it had hoped to make on the (pre-bankruptcy) loan.' Rather, the secured creditor is asking for payment of the profits that it would have made from its post-bankruptcy use of the amount of its secured claim if the debtor had paid its secured claim in cash instead of using the

---

**5.** See Footnote 2 above referring to the requirements of confirmation. Section 1325 is the Code section requiring present value and is only applicable at confirmation. Present value is not a consideration in other determi-nations such as claims allowance. *See* Fed. R. Bankr.P. 3001(f) (proof of claim is prima facie evidence of validity and amount); and *In re Britt*, 199 B.R. 1000, 1008 (Bankr. N.D.Ala.1996).

Bankruptcy Code's cram down power to defer payment of the secured claim." David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates*, 49 Ala. L.Rev. 435, 453 (1998) (quoting *In re Jordan*, 130 B.R. 185, 189 (Bankr.N.J.1991)). "As the Third Circuit explained in *Jones*, recognition of profit is consistent with the objective of section 1325(a)(5)(B)(ii) of putting 'the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral . . . .' " *Id.* (quoting Jones at 69). If creditors were paid immediately, they would reinvest the proceeds. More than likely the proceeds would be reinvested in a new loan, which would also include a profit component. Accordingly, while acknowledging that creditors may be receiving a profit component, this Court finds that for creditors to be "placed in as good a position as they would have been had the present value of their claims been paid immediately" they must be paid a market rate of interest, which includes a profit factor.

The last argument made by the Debtors at the confirmation hearing against a market rate of interest was a statutory construction argument. The Debtors argued that if Congress had intended to tie present value to the contract rate, they would have stated same in the provisions of § 1325(a)(5)(B). This Court believes that is exactly what Congress intended when it mandated that secured creditors receive present value for their claims. Present value includes an interest rate based upon prevailing market rates. A strong indication of market rates is the actual contract rate. Thus, in order to afford secured creditors present value, the contract rate is a good place to begin in determining the correct market rate. The Court specifically notes, as stated above, the contract rate is only the starting benchmark. Debtors and creditors are able to present evidence to adjust the benchmark to the current market rate.

## CONCLUSION

As set forth above, this Court adopts a modified coerced loan method as the appropriate method for determining the current market rate of interest to be paid to secured creditor under § 1325(a)(5)(B)(ii) in a Chapter 13 case. Moreover, the Court holds that in determining the current market rate, there is a rebuttable presumption that the original contract rate agreed upon by the parties is the current market rate. If an objection to the proposed interest rate is filed, the Court will consider the evidence in light of the standard set forth herein.

At the confirmation hearing in the present case, the Standing Chapter 13 Trustee presented evidence of the contract rate by admitting into evidence a copy of the contract entered into between the Debtors and Majr. This evidence establishes an interest rate of 18%. The trustee also presented evidence that the prime rate and the Five Year Treasury Bill rate have declined subsequent to the contract date. This may be considered evidence that the market rate has also been lowered, however, the Court finds this evidence to be inconclusive as to the market rate. Further, the Debtors were not given the opportunity to contest the contract rate or present evidence, if appropriate, as to a prevailing market rate lower than the contract rate. Therefore, a second confirmation hearing is necessary. If the Debtors are unable to present evidence that the prevailing market rate is lower than the contract rate, the Trustee's Objection to confirmation will be sustained and the plan denied confirmation. Conversely, if the Debtors are able to present evidence that

the prevailing market rate is the amount set forth in the plan, 8%, the plan will be confirmed as proposed. The date and time of that hearing shall be set by notice from the Clerk's Office.